FILED

2025 Jul-21  AM 09:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **THOMAS MOORE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:21-cv-01271-MHH** |
| | ) | |
| **VAUGHN LAMBERT,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Thomas Moore contends that when Deputy Sheriff Vaughn Lambert arrested him on October 3, 2019, Deputy Lambert violated his constitutional rights. (Doc. 1). Deputy Lambert has moved for summary judgment on Mr. Moore's claims. (Doc. 32). To resolve the motion, the Court first summarizes the standard that a district court must apply when considering a summary judgment motion. Then, per that standard, the Court discusses the summary judgment evidence, presenting the evidence in the light most favorable to Mr. Moore. Finally, the Court evaluates the evidence under the law that governs Mr. Moore's constitutional claims to see if there are disputed issues of fact that a jury must resolve.

## I.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." FED. R. CIV. P. 56(a). To demonstrate a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if a district court doubts the veracity of the evidence, the court cannot make credibility determinations; that is the work of a factfinder. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Still, conclusory statements in a declaration

2

cannot by themselves create a genuine issue of material fact.  *See Stein*, 881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).  Additionally, where video evidence "obviously contradicts" the non-movant's "version of the facts," a district court must "accept the video's depiction instead of [the non-movant's] account."  *Pourmoghani–Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II.

On October 3, 2019, Mr. Moore received a phone call informing him that his sister-in-law's house was on fire, and he rushed to the scene.  (Doc. 28-2, p. 9, tpp. 26–27).  By the time Mr. Moore arrived, the house had burned, the roof had collapsed, and law enforcement and the fire department were on the scene "watching what was left" of the house.  (Doc. 28-2, p. 9, tpp. 27–28; Doc. 29-1, T21:31:44).  "[M]any people [were] running all over the place."  (Doc. 28-2, p. 14, tp. 47).

Deputy Sheriff Lambert responded to the fire.  Footage from Deputy Lambert's body camera indicates that he asked several people, including Mr. Moore, to move across the road and away from the scene because of the firefighting

operation.  (Doc. 29-1, T21:32).  Mr. Moore obliged.  (Doc. 28-2, p. 10, tp. 31; Doc. 29-1, T21:34:50).

Mr. Moore returned to get his sister-in-law out of an ambulance parked near the house, and the two made their way back "out of the way[] and sat down in [] chairs."  (Doc. 28-2, p. 9, tp. 30; Doc. 29-1, T21:32).  The fire department chief told Mr. Moore, "y'all don't go far," and indicated that he needed to talk to Mr. Moore's sister-in-law.  (Doc. 28-2, p. 14, tp. 47).  Deputy Lambert's body camera footage does not show this sequence because he had turned off his body camera.  (Doc. 29-1, T21:36:41).

Deputy Lambert turned his body camera back on when he began to engage with Mr. Moore.  (Doc. 29-2, T21:38:24).  Deputy Lambert had walked over to Mr. Moore and Mr. Moore's sister-in-law and stated that the fire department was going to be mad that they were near the house again.  (Doc. 28-2, pp. 9–10, tpp. 29–30; Doc. 29-2, T21:38:51–:52; Doc. 29-2, T21:41:33).  Mr. Moore replied:  "fuck the fire department."  (Doc. 28-2, p. 10, tp. 30).  Mr. Moore apologized to Deputy Lambert, but the apology "didn't do any good."  (Doc. 28-2, p. 10, tp. 30).[1]

Deputy Lambert told Mr. Moore to walk across the street with him.  (Doc. 29-2, T21:38:24–:32; *see also* Doc. 28-2, p. 10, tp. 30).  Mr. Moore followed Deputy

---

[1] Mr. Moore apologized to Deputy Lambert before Deputy Lambert restarted his body camera. (Doc. 28-2, p. 14, tp. 48).

Lambert to his marked SUV, (Doc. 29-2, T21:38:42–:46), and Deputy Lambert began cursing at Mr. Moore for "runn[ing] [his] mouth." Mr. Moore responded, and Deputy Lambert instructed Mr. Moore to "lower [his] God-damn voice" when he was talking to him. (Doc. 29-2, T21:38:53–:57). Deputy Lambert remarked: "I'll take your motherfucking ass to jail," and Mr. Moore turned sideways with his hands in front of him and stated "Well, let's go. God damn you." (Doc. 29-2, T21:39:03). Deputy Lambert reached towards Mr. Moore, grabbed Mr. Moore's upper left arm and lower left wrist, and pulled Mr. Moore toward him. (Doc. 29-2, T21:39:00). The two shuffled around to the back passenger side of the police vehicle, and Mr. Moore braced himself on the police vehicle's taillight with his right arm outstretched while Deputy Lambert pulled his left arm behind his back. (Doc. 29-2, T21:39:00–:05). Deputy Lambert said, "God damnit. Disorderly conduct motherfucker," and brought Mr. Moore to the asphalt with a leg sweep. (Doc. 29-2, T21:39:04–:06; Doc. 28-1, p. 10, tp. 31).[2]

As Deputy Lambert stood over Mr. Moore and worked to restrain him, two women, a mother and daughter, approached. (Doc. 29-2, T21:39:09–:12). The mother grabbed at Deputy Lambert's arm, asking him to stop. (Doc. 29-2,

---

[2] As Mr. Moore fell to the street, Deputy Lambert's body camera detached and fell away but continued recording. (Doc. 29-2, T21:39:05–06). Mr. Moore testified that Deputy Lambert "put [him] in a headlock" before executing the leg sweep that caused Mr. Moore to fall to the ground, (Doc. 28-2, p. 15, tp. 51); the video recording contradicts Mr. Moore's recollection of a headlock.

T21:39:09–:12).  Her daughter pulled her away from Deputy Lambert.  (Doc. 29-2, T21:39:06–20).  Deputy Lambert instructed Mr. Moore to put his hands behind his back.  (Doc. 29-2, T21:39:19).  Firefighters and others at the scene of the fire approached.  (Doc. 29-2, T21:39:22).  Two officers joined the scene; one of them placed his hand over Deputy Lambert's body camera.  (Doc. 29-2, T21:39:33-49).  When the officer removed his hand from the camera lens for a moment, Mr. Moore was lying on the ground on his side with someone holding his right ankle.  (Doc. 29-2, T21:39:50).  Deputy Lambert was holding Mr. Moore's right arm behind his back.  (Doc. 29-2, T21:39:51).

Several citizens argued with Deputy Lambert about his conduct.  (Doc. 29-2, T21:39:20–44:02).  Moments later, after Deputy Lambert reattached his body camera, he began walking around the street, stating that he was going to give everyone three seconds to calm down and "make way."  (Doc. 29-2, T21:43:41).  Deputy Lambert stated that if the people on the street did not comply, he "was going to start putting people in jail," and he began to count from one to three.  (Doc. 29-2, T21:43:47–44:05).

Deputy Lambert remarked to the fire chief that he could take care of himself.  (Doc. 29-2, T21:44:18).  Then, Deputy Lambert called dispatch and reported that he had arrested Mr. Moore for disorderly conduct "after me and him had some words."  (Doc. 29-2, T21:47:02–:07).  Next, Deputy Lambert told Deputy Clark, an officer at

the scene, that he arrested Mr. Moore after Mr. Moore said "fuck the fire department" and got in his face. (Doc. 29-2, T21:47:40–48:00). Deputy Lambert stated that he "put [Mr. Moore] on the ground." (Doc. 29-2, T21:48:00–:01). Deputy Lambert added that the other bystanders "started in on" him, "the whole Goddamn bunch," and he said he was "ready to fight." (Doc. 29-2, T21:48:16–:25). As Deputy Clark walked away, Deputy Lambert stated, "hey, the fire chief is the one that asked me to do it." (Doc. 29-2, T21:48:36–:38).

Deputy Lambert next spoke to a bystander, described his initial encounter with Mr. Moore, stated that Mr. Moore's "fuck the fire department" statement was "disorderly conduct" that "started all that mess," indicated that the bystanders with whom he argued did not know what he was made of, and stated that the bystanders with whom he argued were "out of their damn minds." (Doc. 29-2, T21:49:25–50:00). Deputy Clark rejoined Deputy Lambert, and Deputy Lambert began retelling the story of his interaction with Mr. Moore. (Doc. 29-2, T21:51:30). The fire chief joined them too, and Deputy Lambert began recounting his interaction with Mr. Moore again. (Doc. 29-2, T21:51:30–54:45). Deputy Lambert said that he knew that the sheriff was going to hear about his interaction with Mr. Moore, but he was not "going to put up with that crap." (Doc. 29-2, T21:54:25–:41). In his deposition, Deputy Lambert stated that Mr. Moore:

> was enticing a crowd that was already non-compliant. If I would have tried to stay there and rationally or irrationally talk to him in that group

of people, they all – I would have had to shout over them, talk over them, they would have went up against me. At that time, I was the only marked unit there. [Mr. Moore] was the one that spoke up and was enticing. So I pulled him out of that crowd so that I didn't have to work with all of them together, and that's when the altercation occurred.

(Doc. 28-1, p. 7, tp. 19).[3]

Mr. Moore explained in his deposition that Deputy Lambert injured him when he took him to the ground:

I busted my elbows. We're struggling, and he kept hollering quit resisting arrest. I wasn't resisting arrest, I couldn't do anything. I'm sixty-eight years old. He had the cuffs so tight on me . . . that they did bruise my arms. . . . [Deputy Lambert] bruised my ribs. He grabbed me up and threw me in the car.

(Doc. 28-2, p. 10, tpp. 31–32).

Mr. Moore alleges that Deputy Lambert violated his First, Fourth, and Fourteenth Amendment rights by unlawfully seizing him, falsely arresting him, retaliating against him for engaging in protected speech, and using excessive force when taking him to the ground and placing him in handcuffs. (Doc. 1, pp. 4–6, ¶¶ 28–38). In his response to Deputy Lambert's motion for summary judgment, Mr. Moore "agree[d] to the dismissal of count V, [his] excessive force claim based on tight handcuffs." (Doc. 36, p. 20 n.3); *see* FED. R. CIV. P. 41(a)(2) (providing "an

---

[3] In his summary judgment brief, Mr. Moore argues that "[t]here is no evidence that Moore or any of his family members or anyone else hindered firefighting operations or that the fire chief made any such claim." (Doc. 46, p. 4, ¶ 2). The evidence supports this assertion. The evidence also demonstrates that Mr. Moore and several others initially complied with Deputy Lambert's request to move across the street from the fire fighters' operation, but the group later ventured back to the side of the road with the burning house. (*See generally* Doc. 29-1; Doc. 29-2).

action may be dismissed at the plaintiff's request only by court order"). The Court dismisses Count V and turns to Deputy Lambert's motion for summary judgment on Mr. Moore's remaining claims.

### III.

Deputy Lambert argues that qualified immunity shields him from Mr. Moore's claims. (Doc. 33, pp. 7–12, 21–22). "Qualified immunity protects police officers from suit in their individual capacities for discretionary actions performed in the course of their duties." *Carter v. Butts Cnty.*, 821 F.3d 1310, 1318 (11th Cir. 2016) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "This doctrine 'balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Miller v. Palm Beach Cnty. Sheriff's Off.*, 129 F.4th 1329, 1333 (11th Cir. 2024) (quoting *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1157 (11th Cir. 2010)). When qualified immunity attaches, it "grants officials 'an entitlement not to stand trial.'" *Miller*, 129 F.4th at 1333 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

District courts determine whether qualified immunity applies "on a claim-by-claim and defendant-by-defendant basis." *Miller*, 129 F.4th at 1333 (citing *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018)). "To enjoy qualified immunity's

protection, 'a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred.'" *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1323 (11th Cir. 2024) (quotation omitted). If the official meets this burden, then the burden "shifts to the plaintiff to show '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Jarrard*, 115 F.4th at 1323 (quotation omitted). District courts have discretion in determining which of these two questions to answer first. *Pearson*, 555 U.S. at 236.

The discretionary authority "requirement is 'readily satisfied' by 'police officers conducting arrest and investigative functions' while on duty." *Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1363–64 (11th Cir. 2024) (quoting *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019)). District courts "look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). Because Mr. Moore's claims arise out of Deputy Lambert's conduct when arresting Mr. Moore, Deputy Lambert has met his burden of showing that he acted within the scope of his discretionary authority. Therefore, to survive Deputy Lambert's motion, Mr. Moore must carry his burden on his constitutional claims.

With respect to Mr. Moore's illegal seizure claim, the Fourth Amendment prohibits "unreasonable 'seizures' to safeguard '[t]he right of the people to be secure in their persons.'" *Torres v. Madrid*, 592 U.S. 306, 309 (2021). When a police officer, "'by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . a "seizure" has occurred.'" *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). Not all seizures run afoul of the Fourth Amendment. Police officers can "approach[] an individual and ask[] a few questions." *Bostick*, 501 U.S. at 434. Police officers may also, "consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (internal quotation marks omitted) (quoting *Illinois v. Wardlaw*, 528 U.S. 119, 120 (2000)).

When "a reasonable police officer would have known that he lacked reasonable suspicion" to seize an individual, that officer violates clearly established law. *Jackson*, 206 F.3d at 1166 (citations omitted).[4] A "law enforcement officer

---

[4] The Eleventh Circuit has described the reasonable suspicion inquiry as follows:

> Although "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification." "The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." Instead, he must "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." Ultimately, the question is whether "under the totality of the circumstances, from collective knowledge of the officer[s] involved

who reasonably but mistakenly concludes that reasonable suspicion is still entitled to qualified immunity." *Meshal v. Comm'r, Ga. Dep't of Pub. Safety*, 117 F.4th 1273, 1287 (11th Cir. 2024) (internal quotation marks omitted) (quoting *Jackson*, 206 F.3d at 1165–66). "When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had arguable reasonable suspicion to support an investigatory stop." *Meshal*, 117 F.4th at 1287 (internal quotation marks omitted) (quoting *Jackson*, 206 F.3d at 1166). "In undertaking the arguable reasonable suspicion inquiry," the Eleventh Circuit has instructed district courts to "examine the totality of the circumstances to determine whether an officer had a 'particularized and objective' basis to support his suspicion." *Whittier v. Kobayashi*, 581 F.3d 1304, 1309 (11th Cir. 2009) (quotation omitted).

Deputy Lambert seized Mr. Moore because he believed Mr. Moore engaged in disorderly conduct. (*See* Doc. 28-1, p. 7, tpp. 18–20). Under Alabama law, an individual "commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof," that individual "does any of the following":

---

in the stop, [they] had an objectively reasonable suspicion that [the suspect] had engaged in a crime."

*Meshal v. Comm'r, Ga. Dep't of Pub. Safety*, 117 F.4th 1273, 1286 (11th Cir. 2024) (brackets in *Meshal*) (quotations omitted).

(1)  Engages in fighting or in violent tumultuous or threatening behavior. . . .

(2)  In a public place uses abusive or obscene language or makes an obscene gesture. . . .

(6)  Congregates with other person in a public place and refuses to comply with a lawful order of law enforcement to disperse.

ALA. CODE § 13A-11-7(a).[5]  Mr. Moore acknowledges that he said to Deputy Lambert in front of several people "fuck the fire department." (Doc. 28-2, pp. 9-10, tpp. 29-30).  Though Mr. Moore apologized to Deputy Lambert, (Doc. 28-2, p. 10, tp. 30), Mr. Moore's apology does not change the fact that he used profane language in public before a group of people to communicate to Deputy Lambert that he did not intend to comply with his order.  *Cf. Brown v. City of Huntsville*, 608 F.3d 724, 729, 736 (11th Cir. 2010) (concluding officers had arguable probable cause to arrest plaintiff for disorderly conduct because plaintiff played music loudly and officers

---

[5] After the events at issue in this case, Alabama amended its disorderly conduct statute. The amendment did not affect the substantive statutory language relevant to this case. *See* Act of Mar. 10, 2022, 2022 Ala. Legis. Serv. 2022-133 (West) (codified at ALA. CODE § 13A-11-7(a), (c)).

Deputy Lambert argues that subsections (1) and (6) apply here. (Doc. 33, p. 15). Mr. Moore contends that subsection (3) applies. (Doc. 36, pp. 15–17). Mr. Moore argues that subsection (6) does not apply because he "was not in a public place." (Doc. 36, p. 16). Alabama's disorderly conduct statute defines public place as a "place to which the public or a substantial group of persons has access." ALA. CODE § 13A-11-1(2). Mr. Moore does not explain why the definition of public place does not include the fire scene. Deputy Lambert's body camera footage shows that "a substantial group of persons ha[d] access" to the scene. (*See generally* Doc. 29-1; Doc. 29-2). When Deputy Lambert approached Mr. Moore's group the second time, the group stood adjacent to the road. (Doc. 29-2, T21:38:24–:44). Roads fall within the definition of public place. *See* ALA. CODE § 13A-11-1(2) (noting definition of public place "includes but is not limited to highways"). Therefore, Deputy Lambert's interaction with Mr. Moore occurred in a public place.

heard music, even though plaintiff turned music down after officers asked her to do so). Mr. Moore's public, expletive-laced refusal to comply with Deputy Lambert's order gave Deputy Lambert "'particularized and objective' basis to support his suspicion" that Mr. Moore had engaged in disorderly conduct. *Whittier*, 581 F.3d at 1309 (quotation omitted). Thus, Deputy Lambert had arguable reasonable suspicion to seize Mr. Moore for disorderly conduct such that Deputy Lambert is entitled to qualified immunity on Mr. Moore's Fourth Amendment unlawful seizure claim.

As for Mr. Moore's false arrest claim, under the Fourth Amendment, "arrests are seizures and are unreasonable unless supported by probable cause." *Edger v. McCabe*, 84 F.4th 1230, 1235 (11th Cir. 2023) (citation omitted). The presence of probable cause "constitutes an absolute bar to a section 1983 action for false arrest." *Case v. Eslinger*, 555 F.3d 1317, 1326–27 (11th Cir. 2009) (internal quotation marks and quotation omitted).[6] As in the unlawful seizure context, qualified immunity attaches to an officer "if he had even 'arguable probable cause.'" *Edger*, 84 F.4th at 1235 (quotation omitted). Arguable probable cause "exists where "'a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have

---

[6] Probable cause "exists where 'a reasonable officer could conclude—considering all of the surrounding circumstances, including the plausibility of the explanation itself—that there was a "substantial chance of criminal activity."'" *Edger*, 84 F.4th at 1236 (quotation and citation omitted). Whether a police officer has probable cause "depends on the elements of the alleged crime and the operative fact pattern." *Edger*, 84 F.4th at 1237 (internal quotation marks and quotation omitted).

interpreted the law as permitting the arrests."'" *Edger*, 84 F.4th at 1236–37 (quotation omitted).

The Eleventh Circuit's decision in *Brown v. City of Huntsville* illustrates that concept of arguable probable cause. In that case, Ms. Brown drove into a parking lot, playing music loudly. 608 F.3d at 729. Ms. Brown parked and rolled down her window. *Brown*, 608 F.3d at 729. When police officers arrived to conduct an unrelated arrest, one officer asked Ms. Brown to turn down her music; Ms. Brown turned the music off. *Brown*, 608 F.3d at 729. The officer approached Ms. Brown and told her that she "could go to jail for playing music too loud." *Brown*, 608 F.3d at 729. The officer "began yelling and acting 'unprofessional[ly]' towards Brown." *Brown*, 608 F.3d at 729 (brackets in *Brown*). Ms. Brown recorded the officer's actions while the officer ordered her "at least twice to step out of the vehicle, stating she was under arrest and should 'get the fuck out the car.'" *Brown*, 608 F.3d at 729. Ms. Brown had difficulty getting out of the car, a struggle ensued, and the officer used pepper spray on Ms. Brown before arresting her. *Brown*, 608 F.3d at 729–31.

The Eleventh Circuit held that the officer had "at least arguable probable cause" to arrest Ms. Brown for disorderly conduct. *Brown*, 608 F.3d at 736. The Eleventh Circuit concluded that "Brown's actions in playing loud music, stopping her car, and rolling her window down could have indicated to an objectively reasonable officer at the scene that Brown was making unreasonable noise with

intent to create public annoyance, even if those circumstances were insufficient to prove an actual violation of § 13A-11-7." *Brown*, 608 F.3d at 736.

In *Redd v. City of Enterprise*, 140 F.3d 1378 (11th Cir. 1998), police arrested the plaintiff, Thomas A. Anderson, while he was preaching at an intersection in Enterprise, Alabama. 140 F.3d at 1380. Mr. Anderson "admit[ted] that he was speaking loudly enough to be heard across the street," but he asserted that he was "not so loud[] as to be heard over the noise of passing trucks." *Redd*, 140 F.3d at 1380. An officer told Mr. Anderson that he would have to stop preaching if he did not want to be arrested. *Redd*, 140 F.3d at 1381. After a short conversation with the officer, Mr. Anderson "walked back to the street corner and recommenced preaching loudly." The officer arrested Mr. Anderson. *Redd*, 140 F.3d at 1381. The Eleventh Circuit held that the officer had arguable probable cause to arrest Mr. Anderson for disorderly conduct because of his admission "that he succeeded in speaking loudly enough to be heard across the street" and "over traffic" and because passersby complained about the volume of Mr. Anderson's speech. *Redd*, 140 F.3d at 1382.

As in *Brown* and *Redd*, Mr. Moore's "fuck the fire department" remark in front of several people, (Doc. 28-2, p. 10, tp. 30), created probable cause for his arrest for disorderly conduct. Because Deputy Lambert had asked Mr. Moore to move across the road and Mr. Moore had returned, Mr. Moore's profane statement would have caused a "reasonable officer, looking at the entire legal landscape at the

time of the arrest[]" to conclude that Mr. Moore intended "to cause public inconvenience, annoyance, or alarm" when he "refus[ed] to comply with a lawful order of law enforcement." *See Edger*, 84 F.4th at 1236–37 (internal quotation marks omitted and quotation omitted); ALA. CODE § 13A-11-7(a). As in *Brown* and *Redd*, Deputy Lambert had at least arguable probable cause to arrest Mr. Moore for disorderly conduct, so Mr. Moore's unlawful arrest claim fails as a matter of law.

Turning to Mr. Moore's excessive force claim, the "Fourth Amendment's freedom from unreasonable seizures includes the right to be free from excessive force." *Baxter v. Santiago-Miranda*, 121 F.4th 873, 887 (11th Cir. 2024) (citation omitted). "In excessive force cases, the first qualified immunity inquiry—i.e., whether a plaintiff's constitutional rights were violated—is governed by the Fourth Amendment's objective reasonableness standard." *Baxter*, 121 F.4th at 887 (internal quotation marks omitted) (quoting *Baker v. City of Madison*, 67 F.4th 1268, 1279 (11th Cir. 2023)). To analyze reasonableness, district courts "look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *Baxter*, 121 F.4th at 887–88 (internal quotation marks omitted) (quoting *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009)). When an officer "'uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands,'"

the officer's use of force violates the Fourth Amendment. *Patel v. City of Madison*, 959 F.3d 1330, 1343 (11th Cir. 2020) (quotation omitted).

Recently, in *Jones v. Ceinski*, the Eleventh Circuit summarized the standard that district courts must apply in examining the defense of qualified immunity in excessive force cases. 136 F.4th 1057, 1062 (11th Cir. 2025) (citations omitted). In *Jones*, the plaintiff alleged that the defendant law enforcement officer used excessive force during a traffic stop. *See* 136 F.4th at 1061–62. Because Mr. Jones appealed from a summary judgment order in favor of the officer, to determine whether the officer was entitled to qualified immunity, the Eleventh Circuit presented the disputed facts concerning the traffic stop in the light most favorable to Mr. Jones. *See Jones*, 136 F.4th at 1061, 1062. Viewed in that light, the evidence showed that the officer stopped Mr. Jones for a minor traffic violation; Mr. Jones immediately pulled over when the officer started his emergency lights; Mr. Jones waited in his car, provided the papers the officer requested, and volunteered his concealed carry permit for the gun he had in his car. *Jones*, 136 F.4th at 1062–63. Mr. Jones exited his car somewhat slowly because he has a severe hand deformity that made it difficult for him to open the car door. *Jones*, 136 F.4th at 1060. When Mr. Jones refused to tell the officer where his gun was in the car, the officer began swearing at Mr. Jones, using racial epithets. *Jones*, 136 F.4th at 1060–61. When Mr. Jones emerged from the car, the officer "grabbed his wrist, twisted his arm, pushed him

against the car, placed him in a chokehold, and punched him on the top of the head."
*Jones*, 136 F.4th at 1061.

Because Mr. Jones did not dispute that the officer was acting within his discretionary authority during the traffic stop, to avoid summary judgment, Mr. Jones had to "'establish that a reasonable jury could find that [the officer] violated [his] constitutional right'" and that "'his right was clearly established when [the officer] violated it.'" *Jones*, 136 F.4th at 1061–62 (quoting *Nelson v. Tompkins*, 89 F.4th 1289, 1296 (11th Cir. 2024)). With respect to the amount of force the officer used, the Eleventh Circuit explained:

> A claim of excessive force arising from "an arrest, investigatory stop, or other seizure of a free citizen" is reviewed under a standard of "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 395, 399 (1989) (internal quotation marks omitted). "[T]o determine whether the use of force is objectively reasonable, we carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake under the facts of the particular case." *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009) (citation and internal quotation marks omitted). This fact-intensive inquiry requires us to weigh "the quantum of force employed against these factors—the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (citation and internal quotation marks omitted). We also consider "the relationship between the need and amount of force used and the extent of the injury inflicted." *Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019) (internal quotation marks omitted). But we do not "mechanically apply . . . these factors." *Salvato*, 790 F.3d at 1293 (alterations adopted) (citation and internal quotation marks omitted). "In the end[,] we must still slosh our

way through the factbound morass of 'reasonableness.'" *Id.* (alteration adopted) (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)).

. . .

We may consider an officer's language when evaluating the totality of the circumstances, but "words alone [cannot] make . . . an otherwise proper[ ]" use of force "unconstitutional under the Fourth Amendment." *Evans v. Stephens*, 407 F.3d 1272, 1282 (11th Cir. 2005). Because *Graham v. Connor* instructs that an officer's intentions do not affect the objective reasonableness of force, [the officer's] alleged use of racial epithets throughout the encounter is not dispositive. 490 U.S. at 397. The question remains whether [the officer's] use of force was reasonably proportionate to the need for it. *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002).

*Jones*, 136 F.4th at 1062 (some alterations in brackets in *Jones* and some added).[7]

---

[7] Applying these standards to Mr. Jones's version of events, the Eleventh Circuit found that the offense at issue was a "noncriminal traffic violation" that carried a $30 penalty. *Jones*, 136 F.4th at 1062. The minor offense strongly weighed in favor of Mr. Jones. *Jones*, 136 F.4th at 1062–63. So did Mr. Jones's compliance with the officer's instructions. *Jones*, 136 F.4th at 1063. "In the light of Jones's minor traffic infraction and his compliance throughout the stop, the reasonableness of [the officer's] force depends on the threat posed by Jones's access to his firearm." *Jones*, 136 F.4th at 1063.

The Eleventh Circuit held that the firearm in Mr. Jones's car would allow a reasonable officer to use some force to control Mr. Jones's access to the weapon, but the amount of force used had to be commensurate to the threat the firearm posed. *Jones*, 136 F.4th at 1063 (quoting *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (citations omitted)). Mr. Jones's demonstrated willingness to comply with the officer's instructions did not preclude the officer from using force to ensure that Mr. Jones could not access the firearm. The Eleventh Circuit stated:

the threat of harm to an officer from an individual—even a compliant one—who has access to a firearm during a late-night traffic stop is not negligible. And we must evaluate the situation "through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision . . . in circumstances where inaction could prove fatal."

*Jones*, 136 F.4th at 1064 (quoting *Crosby v. Monroe County*, 394 F.3d 1328, 1334 (11th Cir. 2004)). The Eleventh Circuit held that the initial force the officer used to restrain Mr. Jones, the "wrist grab, arm twist, and push maneuvers[,] were reasonable uses of force to restrain him."

Mr. Moore relies heavily on *Patel*, which, like *Jones,* concerns an alleged gratuitous use of force.  (Doc. 36, pp. 20–22).  In *Patel*, patrol officers received a call from dispatch about a possible trespasser in a neighborhood near them.  959 F.3d at 1333.  The officers drove to the neighborhood and saw Mr. Patel walking near the area in which the possible trespass occurred.  *Patel*, 959 F.3d at 1333.  The officers stopped to question Mr. Patel, but he would not engage with them.  *Patel*, 959 F.3d at 1333–34.

The Eleventh Circuit credited Mr. Patel's version of the events when the available dashcam footage of the interaction did not contradict Mr. Patel's account. *Patel*, 959 F.3d at 1334–35, 1339.  Viewed in the light most favorable to Mr. Patel, the evidence showed that the officer "took hold of" Mr. Patel, Mr. Patel "made no movements of resistance" or "otherwise interfere[d]" with the officer's frisk of Mr. Patel's pockets, and the officer "applied great force in" using a leg sweep to bring Mr. Patel to the ground after Mr. Patel made a "minor adjustment of his foot."  *Patel*, 959 F.3d at 1339.  Mr. Patel required surgery for his injuries and sustained

---

*Jones*, 136 F.4th at 1064.  The Eleventh Circuit reversed the district court's summary judgment order on Mr. Jones's excessive force claim because "[t]aking Jones's version of events as true, he was subdued and in [the officer's] control after the wrist grab, twist, and push" such that "the additional chokehold and punch were gratuitous and excessive uses of force."  *Jones*, 136 F.4th at 1065.  The officer could continue to use force "*only* until Jones was 'fully secured.'"  *Jones*, 136 F.4th at 1065 (italics in *Jones*).  After that, even a single punch might be excessive if the punch were delivered to an individual "who no longer 'pose[d] a danger' to anyone."  *Jones*, 136 F.4th at 1065 (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008)).

"permanent partial paralysis." *Patel*, 959 F.3d at 1341. The Eleventh Circuit concluded that "[b]ecause a jury could reasonably find that Patel was not resisting, it could reasonably conclude that [the officer] 'had no reason to use the force that he did on [Patel] that resulted in severe and permanent physical injuries.'" *Patel*, 959 F.3d at 1339–40 (brackets added and in *Patel*) (quotation omitted).

Here, the evidence viewed in the light most favorable to Mr. Moore shows that he was one of several neighbors and relatives who gathered to provide support to a woman as local firefighters extinguished a fire that destroyed her home. (*See generally* Doc. 29-1; Doc. 29-2). The people who gathered were roaming about but were not interfering with the work of the firefighters who were monitoring the last of the embers from the fire. (*See generally* Doc. 29-1; Doc. 29-2). A reasonable officer would not view Mr. Moore or the others gathered as a threat to his safety or the safety of others. There is no evidence that Mr. Moore or anyone else at the scene of the fire was armed. The video evidence shows that after Deputy Lambert asked Mr. Moore and others to stand across the street from the smoldering house, Deputy Lambert stood near the house, telling war stories with the fire chief and others; the work of extinguishing the fire was over. As he visited, Deputy Lambert turned off his video camera. Jurors could infer from this evidence that Deputy Lambert did not feel like the individuals at the fire scene were a threat to him, to the firefighters, or to one another. The individuals at the scene were perhaps an unwanted nuisance,

but they were not interfering with the firefighters' work or placing themselves or anyone else in danger.

As Deputy Lambert visited with others at the scene, Mr. Moore, his sister-in-law, and others returned to the sidewalk near his sister-in-law's smoldering house. Because there is no video evidence that contradicts Mr. Moore's testimony, the Court accepts his testimony that the fire chief had instructed he and the others near him to stay where they were after they had walked back across the street so that he (the fire chief) could talk to Mr. Moore's sister-in-law.  (*See* Doc. 28-2, p. 14, tp. 47).  When Deputy Lambert approached the group of people with whom Mr. Moore was standing and remarked that the fire chief was going to be mad that they had moved closer to the burned house, Mr. Moore said "fuck the fire department."  (Doc. 28-2, p. 10, tp. 30).

Mr. Moore apologized and complied without hesitation when Deputy Lambert told Mr. Moore to come with him, removing Mr. Moore from the group.  (Doc. 29-2, T21:38:24–:32; *see also* Doc. 28-2, p. 10, tp. 30).  Mr. Moore followed Deputy Lambert to his marked SUV, (Doc. 29-2, T21:38:42–:46); Mr. Moore was silent as he walked.  When Deputy Lambert and Mr. Moore reached the SUV, Mr. Moore stood close to Deputy Lambert.  Deputy Lambert began upbraiding Mr. Moore, telling him that if he wanted to "run his fucking mouth," he should run it to him. (Doc. 29-2, T21:38:44).  When Mr. Moore disagreed with Deputy Lambert's

characterization of his comment, Deputy Lambert threatened to arrest Mr. Moore, stating that he would take Mr. Moore's "fucking ass" to jail. (Doc. 29-2, T21:38:57–:59). Mr. Moore replied, "well, let's go," and took a step back from Deputy Lambert. (Doc. 29-2, T21:39:00). The crime for which Deputy Lambert threatened to arrest Mr. Moore, disorderly conduct, is a Class C misdemeanor under Alabama law. ALA. CODE § 13A-11-7(b).

Mr. Moore's response to Deputy Lambert was inappropriate, but he stepped away from Deputy Lambert, not toward him in a threatening manner. Again, there is no evidence that Mr. Moore was armed. Though there is no evidence that Deputy Lambert knew Mr. Moore's age, Mr. Moore was clearly much older than Deputy Lambert and not very fit. Under these circumstances, given Mr. Moore's profane remark and his flippant response to Deputy Lambert's threat to take his "fucking ass" to jail, a reasonable officer might grab Mr. Moore's wrist to control him and perhaps place him in handcuffs, but a reasonable officer would not use a leg sweep to take down a sixty-eight-year-old citizen who had cursed, apologized, and moved away cooperatively and silently to an area that the officer controlled. Objectively speaking, a reasonable officer would have understood that emotions were running high because of the tragedy that had just unfolded and would have tried to deescalate the situation when he removed Mr. Moore to a safe distance. Notably, a few minutes before Deputy Lambert's encounter with Mr. Moore, Deputy Lambert had

threatened to take another bystander to jail for driving past a roadblock several feet away from the fire (after, as it turns out, the officer at the roadblock gave the driver permission to pass), (Doc. 29-1, T21:32:43–34:00), and Deputy Lambert threatened to take everyone at the scene to jail if they did not disperse at the count of three, (Doc. 29-2, T21:43:4–44:05).  Minutes after he secured Mr. Moore in his patrol SUV, Deputy Lambert told Deputy Clark that when he took Mr. Moore to the ground, others "started in on" him, "the whole Goddamn bunch," and he said he was "ready to fight."  (Doc. 29-2, T21: 48:16–:25).  Jurors could conclude that Deputy Lambert was instigating discord at the fire scene.[8]

But even if a reasonable officer would have cursed at Mr. Moore and threatened to take his "fucking ass" to jail, a reasonable officer would not have used a leg sweep to take a visibly upset, older gentleman to the ground because the gentleman was disrespectful.  A few days after the takedown, Mr. Moore went to the emergency room complaining of back pain.  He had back surgery later that month.  (Doc. 28-2, pp. 5–6).  The unnecessary leg sweep also caused Mr. Moore to suffer bruised arms and ribs.

---

[8] Deputy Lambert argues that he did not use excessive force when taking Mr. Moore to the ground with a leg sweep because Mr. Moore "[wa]s resisting being placed in handcuffs, other non-compliant individuals that either kn[e]w or [we]re related to the arrestee [we]re nearby, and the officer executing the leg sweep [wa]s the only officer on the scene."  (Doc. 33, p. 20).  Deputy Lambert's bodycam video demonstrates Deputy Clark appeared seconds after Deputy Lambert took Mr. Moore to the ground.  Deputy Clark then put his hand over Deputy Lambert's video camera to preclude video evidence of Deputy Lambert's handling of Mr. Moore once Mr. Moore was on the ground.  (*See* Doc. 29-2, T21:39:36–43:18).

Viewing this evidence in the light most favorable to Mr. Moore, a reasonable jury could determine that Deputy Lambert's use of force in taking Mr. Moore to the ground "was both gratuitous and excessive," given the Class C misdemeanor concerning ill-chosen words, the very minimal threat of harm to Deputy Lambert and others, Deputy Lambert's use of profane language toward Mr. Moore, and the extent of Mr. Moore's injuries relative to the minimal threat of harm to Deputy Lambert. *See Patel*, 959 F.3d at 1339.   As for whether Deputy Lambert violated Mr. Moore's clearly established rights, if a jury believes that Mr. Moore was not resisting arrest when Deputy Lambert executed a leg sweep and took Mr. Moore to the pavement, the jury "could reasonably find that [Deputy Lambert] knowingly violated [Mr. Moore's Fourth Amendment rights]."   *Patel*, 959 F.3d at 1343. Therefore, qualified immunity does not shield Deputy Lambert from Mr. Moore's excessive force claim based on the leg sweep.

With respect to Mr. Moore's retaliation claim, Mr. Moore asserts that Deputy Lambert seized him, arrested him, and used excessive force against him in retaliation for engaging in protected speech by cursing at the fire department.  (Doc. 1, pp. 2, 5, ¶¶ 11, 33–34).[9]   The First Amendment "'prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech."

---

[9] Protected speech includes spoken words.  *MGFB Props., Inc. v. Viacom Inc*, 54 F.4th 670, 678 (11th Cir. 2022) (citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995)).

*Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quotation omitted). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Nieves*, 587 U.S. at 398 (quotation omitted).

"To prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves*, 587 U.S. at 398 (quotation omitted). The retaliatory animus "must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves*, 587 U.S. at 399 (quotation omitted). "The causal inquiry is complex because protected speech is often a 'wholly legitimate consideration' for officers when deciding whether to make an arrest." *Nieves*, 587 U.S. at 401 (quotation omitted). "[I]t is particularly difficult to determine whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct." *Nieves*, 587 U.S. at 402) (citation omitted). As a result, for example, the Supreme Court in *Nieves* held that a "plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Nieves*, 587 U.S. at 402.[10]

---

[10] As discussed in this opinion, because the circumstances of this case fall within the exception outlined in *Nieves*, the Court does not decide whether the holding in *Nieves* extends to shield Deputy Lambert because he had arguable reasonable suspicion and arguable probable cause to

"Although probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves*, 587 U.S. at 406. "In such cases, an unyielding requirement to show the absence of probable cause could pose 'a risk that some police officers may exploit the arrest power as a means of suppressing speech.'" *Nieves*, 587 U.S. at 406 (quotation omitted). The "no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 407 (citation omitted).

Mr. Moore argues that the *Nieves* exception applies because Deputy Lambert did not seize, arrest, or use excessive force against other non-compliant individuals who disobeyed Deputy Lambert's instructions or engaged in protected speech. (Doc. 36, p. 20). When Deputy Lambert first asked Mr. Moore to go across the road, Mr. Moore was with several individuals.[11] They all crossed the road as instructed. When they wandered back across the street, only Mr. Moore engaged verbally with Deputy Lambert, but all were on the wrong side of the street. Deputy Lambert

---

seize and arrest Mr. Moore for disorderly conduct.

[11] The individuals included Mr. Moore, a man in a gray shirt with long hair and a beard, a woman in a dark shirt, and a man in a white shirt with red stripes. (*See* Doc. 29-1, T21:32:28).

arrested only Mr. Moore. Deputy Lambert did not arrest the individuals who yelled at him to stop using force against Mr. Moore. The evidence that Deputy Lambert singled out Mr. Moore "presents objective evidence that [Mr. Moore] was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been," in violation of Mr. Moore's clearly established rights. *See Nieves*, 587 U.S. at 407 (citation omitted). Qualified immunity does not shield Deputy Lambert from Mr. Moore's First Amendment retaliation claim.

## IV.

Accordingly, the Court grants in part and denies in part Deputy Lambert's motion for summary judgment. The Court grants Deputy Lambert's motion on Mr. Moore's illegal seizure and false arrest claims because qualified immunity shields Deputy Lambert from liability under these claims. The Court denies Deputy Lambert's motion on Mr. Moore's excessive force and retaliation claims because qualified immunity does not shield Deputy Lambert from liability for these claims. The Court dismisses Mr. Moore's excessive force claim based on tight handcuffs pursuant to Rule 41(a)(2).

By separate order, the Court will set this case for trial. The Clerk shall please TERM Doc. 32.

**DONE** and **ORDERED** this July 21, 2025.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE